WAYNE COUNTY PROSECUTING ATTORNEY *v.* GROSSE ILE
BRIDGE COMPANY.

1. COUNTIES—CONSTITUTIONAL LAW—FRANCHISES.

Limitation in Constitution upon power of a "municipality" to
grant a franchise or license for a period no longer than 30
years is not a limitation upon the power of a county .(Const.
1908, art. 8, §§ 14, 29).

2. FRANCHISES—DURATION—BRIDGE COMPANY—STATUTES.

Where statute under which defendant bridge company was or-
ganized provided that. the legislature might at any time alter
or amend such act and that companies organized· thereunder
should at all times be subject to all general laws in force
relative to such companies, the franchise granted was not a
perpetual franchise, but defendant had franchise rights sub-
ject to the action of the legislature (Const. 1908, art. 12,
§ 1; 2 Comp. Laws 1915, § 8736 *et seq.*).

Appeal from Wayne; Ferguson (Frank B.), J.
Submitted January 15, 1947. (Docket No. 68, Cal-
endar No. 43,610.) Decided June 27, 1947.

Quo warranto by William E. Dowling, Prosecut-
ing Attorney of Wayne County, against Grosse Ile
Bridge Company, a Michigan corporation, to as-
certain by what right it operates a toll bridge.
Gerald K. O'Brien, substituted as relator. Judg-
ment for plaintiff. Defendant appeals. Reversed
and information dismissed.

*Gerald K. O'Brien* and *James N. McNally,* Prosecuting Attorneys, *Arthur L. Robbins, J. Lynn Fewlass* and *Philip A. McHugh,* Assistant Prosecuting Attorneys, for plaintiff.

*Ward Culver (Angell, Turner, Dyer & Meek,* of counsel), for defendant.

SHARPE, J. This is an action in quo warranto brought by the prosecuting attorney in behalf of Wayne county, Michigan, against Grosse Ile Bridge Company to test the right of defendant company to operate a toll bridge across the Detroit river between Grosse Ile and the mainland.

The facts from which the issues in this cause evolve are not in dispute and are as follows: The Grosse Ile Bridge Company was incorporated May 1, 1912, under the provisions of Act No. 83, Pub. Acts 1851, as amended (2 Comp. Laws 1915, § 8736 *et seq.*). The corporate term of the company was fixed in its certificate of incorporation at 30 years. On April 22, 1942, its corporate term was extended 30 years from and after May 1, 1942.

Act No. 83, Pub. Acts 1851, provides in part as follows:

"SECTION 1. * * * Any number of persons may associate for the purpose of constructing a bridge over any stream, not less than three hundred feet across, upon such terms and conditions, and subject to the liabilities prescribed in this act, and to take and receive such amount of toll for the passage of persons, teams, vehicles, and animals across such bridge, as the board of supervisors in the county or counties in which such bridge is situated may prescribe, as hereinafter provided.

"Sec. 2. Such persons, under their hands and seals, shall make a certificate which shall specify: * * *

"6th. The term of its existence, not to exceed thirty years; * * *

"Sec. 5. No company formed or created under this act shall construct any bridge across any stream until they shall have obtained the assent of the board of supervisors of the county in which the same is to be constructed; * * *

"Sec. 6. The board of supervisors of the county in which [any] such bridge is to be constructed, shall, at the time of granting such assent to the construction of such bridge * * * fix and establish the rates of toll to be paid for passing such bridge. * * *

"Sec. 15. The legislature may at any time alter or amend this act, and all companies formed under this act shall at all times be subject to all general laws in force relative to bridge companies."

On November 9, 1909, Peter N. Jacobsen of Detroit, Michigan, petitioned the board of supervisors of Wayne county to grant him a permit to build a bridge across the west branch of the Detroit River according to certain plans and specifications. On January 5, 1910, the board of supervisors adopted a resolution which granted consent, permission and authority to "said Peter N. Jacobsen, of Detroit, Michigan, and to his successors when incorporated, and to his heirs and assigns, to build, construct and own and forever maintain and operate a concrete arch bridge for the passage of persons, cars, vehicles, animals, et cetera, from a point in the township of Monguagon, Wayne county, Michigan, about three-fifths of a mile south of the southerly boundary of the city of Wyandotte, across and as near as practicable at right angles to the west branch of the Detroit river to the island of Grosse Ile, in said

township, with an open span therein of not less than 190 feet wide located at about the center thereof, the whole to be built according to said plans and specifications.''

The assent to the construction of the bridge was, on April 1, 1910, assigned to Alexander Riopelle and by him assigned to the Grosse Ile Railway company on May 6, 1910. The railway company was incorporated on May 4, 1910, under the railroad, bridge and tunnel act (Act No. 198, Pub. Acts 1873, as amended)* for the purpose of constructing a line of railway from a point near the city of Wyandotte to the Michigan Central Railroad station on Grosse Ile.

In April, 1912, the railway company petitioned the board of supervisors for consent to construct the bridge according to certain modified plans. In response to said petition the board of supervisors on April 25, 1912, adopted a resolution stating that:

''Consent, permission and authority be and the same is hereby given and granted to said Grosse Ile Railway Company, assignee of Peter N. Jacobsen, and its successors and assigns, to build and construct the bridge contemplated and provided in said license or authority granted on January 5, 1910, * * * in accordance with the modified plans and specifications filed with this board on April 9, 1912, as aforesaid.''

On May 1, 1912, the railway company assigned all of its rights under the above resolution to the Grosse Ile Bridge Company, defendant, which thereafter constructed the bridge and operated the same as a toll bridge.

Negotiations for the purchase of the bridge by the county were carried on until 1940, but no agree-

* See 2 Comp. Laws 1929, § 11110 *et seq.* (Stat. Ann. § 22.201 *et seq.*).—REPORTER.

ment was ever reached for the purchase of the same. On October 27, 1942, the board of supervisors adopted a resolution directing the prosecuting attorney to commence proceedings for the purpose of terminating defendant's franchise and ousting it therefrom. On August 5, 1943, the prosecuting attorney began the present action at law in the nature of quo warranto. On October 1, 1945, the board of supervisors passed a resolution purporting to revoke the franchise of the Grosse Ile Bridge Company.

The defendant filed an answer to the petition in which it is alleged that the franchise granted by the board of supervisors was a perpetual franchise; and that it had a legal right to operate the bridge and collect tolls thereunder.

The cause came on for trial and on October 7, 1946, the trial court filed an opinion in which it is stated:

"Is is therefore my opinion that the franchise is a State franchise and the county is the agent of the State, authorized by law to grant the franchise, and can only act as agent of the State within the powers conferred upon it by legislative enactment. * * *

"The county having been designated as a body corporate under the Constitution and established for political purposes and having subordinate and local powers of legislation, can only be construed as a municipal corporation. Therefore, it is my opinion that the word 'municipality' as used in section 29 of article 8 of the Constitution of 1908, is broad enough to include a county, and the prohibition against any municipality granting a franchise for a longer period than 30 years is a limitation upon a county as well as a city.

"For the reasons hereinbefore stated, it is my opinion that, the county could not grant a franchise to respondent for a longer period than 30 years, and

its attempt to grant the franchise to respondent in perpetuity was a nullity, and the right of the respondent to collect tolls under its original franchise expired on May 1, 1942.  *  *  *

"I am of the opinion that when this bridge and its approaches were completed, it then and there became the property of the public, subject to the right of the respondent to collect tolls during the term of its franchise, but on the expiration of the franchise the public had the right to the free use of the bridge and its approaches."

A judgment was entered in conformity with the above opinion including an order that further proceedings may be taken to determine whether plaintiff has a claim for damages sustained by the county through the collection of tolls from the date of the termination of the franchise until the date the bridge is actually turned over to the county.

Defendant appeals and urges that a franchise to collect tolls acquired by a toll bridge company organized and operating under the provisions of Act No. 83, Pub. Acts 1851, is not a franchise granted by a municipality within the meaning of that term as used in article 8, § 29, of the Constitution of 1908 providing that: "No franchise or license shall be granted by any municipality of this State for a longer period than thirty years;" that defendant's franchise to operate a toll bridge did not expire May 1, 1942, the expiration date of its original corporate franchise; and that the court has no right to retain jurisdiction of the cause for the purpose of determining what damages, if any, the county may collect by reason of the fact that tolls were collected for several years after the expiration of the original corporate franchise.

We shall first consider whether Act No. 83, Pub. Acts 1851, under which the bridge company was

organized was a general or special act. A review of the history of legislative power and constitutional limitations upon the creating of corporations is helpful.

In an article by Horace L. Wilgus, "Changes Effected by the New Michigan Corporation Act" (Act No. 84, Pub. Acts 1921 in 1 Michigan State Bar Journal, p. lvii, the following appears:

"The governor and judges of the Territory of Michigan provided for incorporation under special acts, and by general laws. The legislative council did the same. The Constitution of 1835 provided, 'The legislature shall pass no act of incorporation unless with the assent of two-thirds of each house.' The legislature continued to create corporations by special acts, but in 1837 enacted two general laws, one for the creation of banks, and one for corporations for manufacturing purposes, and the Revised Statutes of 1838 contained general laws for the incorporation of medical societies, religious societies, and libraries and lyceums. These were continued in the Revised Statutes of 1846, and a general law for the incorporation of proprietors of burying grounds had been added in 1840.

"In 1839 the legislature forbade further incorporation under the general banking law of 1837, and in 1844 the Supreme Court held it unconstitutional, construing the constitutional provision as forbidding the legislature to provide for the creation of an indefinite number of banking corporations under one general law. This, although contrary to the decision of the Federal circuit court, apparently made all the then existing general corporation laws invalid.

"The Constitution of 1850, therefore, provided, 'Corporations may be formed under general laws; but shall not be created by special act, except for municipal purposes. All laws passed pursuant to this section may be altered, amended or repealed.' And no act of incorporation before granted should

be altered or amended without the assent of two-thirds of the members elected to each house. *Formed* and *created* have been given a strict, and *alter* and *amend* a liberal meaning. * * *

"After the Constitution of 1850 went into effect, the legislature of 1851 passed general laws for the incorporation of telegraph, bridge (Act No. 83, Pub. Acts 1851) * * * companies. * * *

"Notwithstanding the constitutional provision of 1850, and these general acts, it seems that the decision of the Supreme Court (*Green* v. *Graves* [1844], 1 Doug. [Mich.] 351), had cast doubt on the policy of broad general incorporation laws, and as Major Pepper says, 'it would appear that little faith was at first placed in general laws, because practically every species of company, desiring some special privilege, went to the legislature for a brand new law under which to organize,'—and got it, of course, cast in the general form. Everyone familiar with our statutes knows to what an absurd and intolerable extent this has been carried, Revision and simplification began in 1873, with the railroad law. * * * These repealed more than 150 acts, and the new act (1921) repeals 100 more and brings corporations organized under many others under its provisions."

The important case of *Green* v. *Graves* (1844), 1 Doug. (Mich.) 351, held that general corporation laws were void and each corporation had to be especially chartered under the then existing Constitution. In discussing the constitutional provision on page 362, we said:

"It becomes necessary, then, to inquire into the reasons and object of the constitutional provision in question, that we may be able to determine with accuracy its true spirit and meaning. The restriction contained in the provision is unusual, and repugnant to all our notions of a representative

government, where the vote of a majority controls in primary assemblages of the people, at an election, in our legislative halls, and in courts of justice. \* \* \* The framers of the Constitution (1835), therefore, in incorporating into that instrument a rule in opposition to a principle which lies at the foundation of our political system, must have found their justification in the conviction that such a provision was called for by imperious necessity, or from motives of policy, so strong and overruling, as to authorize an innovation of a long-established and deeply-cherished maxim. Let me now advert to some of those 'circumstances extrinsic of the act,' for the purpose of discovering the reason or 'cause of the act.' The Constitution of Michigan was formed in 1835. All who are familiar with the history of that period will bear testimony to the fact, that a strong public feeling existed against corporations, and especially in respect to those possessing banking powers. It may be said to have been the absorbing question of the day. The community were [was?] alarmed at the vast increase of corporations. They feared the power which such institutions were capable of wielding. The belief was entertained that this power had actually been wielded for bad purposes. It was argued that all corporations were, in a greater or less degree, monopolies, and hence the prejudices of the community were arrayed against them. \* \* \* Such were some of the circumstances under which the provision was incorporated into our Constitution, circumstances well calculated to challenge the attention of the convention, and induce that body to devise new guards, by which the community might be protected against the evils growing out of legislation in respect to corporations. But the object they had in view could not be achieved, unless some statutory check was imposed, by which to prevent the multiplication of corporations. This was the crying evil; for, in proportion as they increased, in just that

proportion would the evils to which I have adverted increase also.''

The Constitution of 1850 provided:

''Corporations may be formed under general laws; but shall not be created by special act, except for municipal purposes. All laws passed pursuant to this section may be altered, amended or repealed.'' Article 15, § 1.

The defendant in the case at bar was incorporated under Act No. 83, Pub. Acts 1851. This act provided that any number of persons might associate for the purpose of constructing a toll bridge with the term of existence of the corporation not to exceed 30 years. This act having been passed under the above 1850 constitutional provision is a general law pertaining to a specific class of corporations.

Defendant urges that at the time of its incorporation in 1912 it had the right to extend its corporate term under the provisions of Act No. 328, Pub. Acts 1905; and that these rights have been preserved in both Act No. 84, part 5, chap. 3, § 2, Pub. Acts 1921 (2 Comp. Laws 1929, § 10135), and in the Michigan general corporation act of 1931, Act No. 327, § 189, Pub. Acts 1931 (Comp. Laws Supp. 1933, § 10135-189, see Stat. Ann. § 21.190).

The Constitution of 1850 as originally adopted contained no provision authorizing the legislature to provide for extension of corporate term of existence. Following the decision in *Attorney General, ex rel. Mason,* v. *Perkins,* 73 Mich. 303, decided in January, 1889, there was ratified a constitutional amendment, article 15, § 10, which provided for one or more extensions of corporate life, not exceeding 30 years for each extension. Act No. 328, Pub. Acts 1905, was passed under the authority granted by the constitutional amendment of 1889. The right to ex-

tend corporate existence was granted to all corporations organized under the *general* laws of the State. It further provided in section 2 that "a corporation which has thus been renewed shall be the same corporation, and hold and own all the rights, franchises and property held and owned by the corporation before renewal."

It should be noted that it was not until 1921 that there was any general corporation code in this State. The bridge act of 1851 was not repealed until the general corporation act of 1921. It should also be noted that the bridge act contained no authority for extension of corporate existence. In our opinion the 1905 act authorized the extension of existence of corporations organized under the bridge act of 1851.

Plaintiff cites *Rockwith, ex rel. Kerns,* v. *State Road Bridge Co.,* 145 Mich. 455, as authority for the proposition that corporations organized under the bridge act of 1851 do not have the right to extend their corporate existence. In the above case the bridge company was organized in 1875, prior to the 1889 constitutional amendment. This case does not decide whether a bridge corporation incorporated subsequent to the 1889 constitutional amendment and the 1905 act could be extended under the 1905 act. Furthermore, in this case although there was no limitation of time stated in the franchise it was granted to the bridge company and not to its successors and assigns. It was there said:

"Conceding that the action of the board of supervisors was regular, we think it very clear the board of supervisors did not intend to grant, and the grantee did not suppose they were getting, a franchise for a longer period of time than the life of the corporation."

In the case at bar, the grant was to Peter N. Jacobsen and to his successors when incorporated,

and to his heirs and assigns and to Grosse Ile Railway Company and to "its successors and assigns." It contained no limitation of time that the franchise was to run. We do not think the *Rockwith Case* is controlling in the case at bar for the reasons above suggested.

In *City of Benton Harbor* v. *Michigan Fuel & Light Co.,* 250 Mich. 614 (71 A. L. R. 114), the principle of law was established that if a franchise runs to a corporation and to its successors and assigns without limitation of time, the renewal of the corporate life of the corporation also extends the life of the franchise so granted. However, at the time defendant, in the case at bar, was incorporated in 1912, the 1908 Constitution of Michigan provided in article 8, § 29:

"No franchise or license shall be granted by any municipality of this State for a longer period than thirty years."

Defendant urges that the franchise is a State franchise with no limitation upon the period that such franchise may be exercised other than as limited by the period of its corporate existence.

The trial court's views upon this question read as follows:

"It is therefore my opinion that the franchise is a State franchise and the county is the agent of the State, authorized by law to grant the franchise, and can only act as agent of the State within the powers conferred upon it by legislative enactment."

In the *City of Niles* v. *Michigan Gas & Electric Co.,* 273 Mich. 255, we said:

"The grant of a franchise is an exercise of the sovereign power of the State, vested in the legislature. The power may be delegated to municipalities but, when so delegated, the municipality exercises

it as agent of the State and upon the conditions prescribed by law. , 26 C. J. pp. 1013, 1024 *et seq.;* 12 R. C. L. p. 186. Sections 25 and 29 [Const. 1908, art. 8] do not purport to withdraw from the legislature its sovereign power over franchises and confer it upon municipalities. They do no more than establish limits of time and conditions of irrevocability of such franchises as the legslature may delegate to municipalities the power to grant.''

In our opinion the franchise to collect tolls acquired by the bridge company under the provisions of Act No. 83, Pub. Acts 1851, was an exercise of the power of the State with certain duties delegated to the board of supervisors. The board of supervisors gave consent to the erection of the bridge. The duty of fixing tolls was not a grant of power which the board might exercise or decline to exercise. Once the consent was given, the duty to fix tolls became mandatory by virtue of the act. The board in giving assent acted as a representative of the State and in the interests of the general public.

In view of the fact that the franchise is a State franchise, article 8, § 29, of the Constitution of 1908, has no application. As we have found that the bridge company has the right to renew its corporate life under Act No. 328, Pub. Acts 1905, it follows that when the board of supervisors gave its consent to the operation of the bridge without term limitation, the right so granted must continue in effect throughout the corporate life of the grantee.

The judgment of the circuit court is reversed and a judgment will be entered therein, dismissing the information filed in this cause. A public question being involved, no costs are awarded.

Bushnell, and Dethmers, JJ., concurred with Sharpe, J.

BUTZEL, J. (*concurring*).   When defendant was incorporated on May 1, 1912, under the provisions of Act No. 83, Pub. Acts 1851, as amended, the 1908 Constitution of the State of Michigan provided in article 8, § 29:

"No franchise or license shall be granted by any municipality of this State for a longer period than thirty years."

The trial court held that the word "municipality," as used in the above quoted section, is broad enough to include a county, and that the prohibition against any municipality granting a franchise for a longer period than 30 years is a limitation upon a county as well as a city.   Although fully cognizant of the many cases cited by appellee in which courts of other jurisdictions have held that municipalities included counties and other political subdivisions within the meaning of constitutional provisions, nevertheless, I am in accord with appellant that the controlling consideration herein is, what did the constitutional convention which drafted the Constitution of 1908 mean when it used the word "municipality" in article 8, § 29?   Was it intended that a county be embraced by the word "municipality?"

Turning to the Constitution of 1850, it is noted that article 18, § 4 thereof provided:

"No navigable stream in this State shall be either bridged or dammed without authority from the board of supervisors of the proper county under the provisions of law."

This section was superseded by article 8, § 14, of the Constitution of 1908 which provided:

"No navigable stream of this State shall be bridged or dammed without permission granted by the board of supervisors of the county under the

provisions of law, which permission shall be subject to such reasonable compensation and other conditions as may seem best suited to safeguard the rights and interests of the *county and the municipalities therein.*"

From the clause added by the Constitution of 1908, it is apparent that the constitutional convention which drafted that instrument recognized a clear-cut distinction between counties and municipalities in the light of which the conclusion is inescapable that the word "municipality" as used in section 29 of the same article is not sufficiently broad to include a county, and that the prohibition against any municipality granting a franchise for a longer period than 30 years is not a limitation upon a county.

However, it should be added that in our opinion defendant does not possess a franchise which in a strict sense is a perpetual franchise in which it has a vested right. This follows from the fact that Act No. 83, Pub. Acts 1851, as amended, under which the bridge company was incorporated, contains the following:

"SEC. 15. The legislature may at any time alter or amend this act, and all companies formed under this act shall at all times be subject to all general laws in force relative to bridge companies."

By so providing, the State expressly reserved the power to alter or amend the law under which defendant's predecessor became possessed of the right or franchise under which tolls could be collected. Defendant, as an assignee, stands in the same position.

Further, in the 1908 Constitution, under which defendant obtained an extension of its corporate franchise, it is provided:

"All laws heretofore or hereafter passed by the legislature for the formation of, or conferring rights, privileges or franchises upon corporations and all rights, privileges or franchises conferred by such laws may be amended, altered, repealed or abrogated." Article 12, § 1.

Hence it cannot be said that in a strict sense, defendant is possessed of a perpetual franchise. Instead, under both the statutory and constitutional provisions above quoted, defendant's franchise rights are subject to action of the legislature.

For the reasons above stated and to the extent herein indicated, I concur in the result reached by MR. JUSTICE SHARPE's opinion.

CARR, C. J., and BOYLES, REID, and NORTH, JJ., concurred with BUTZEL, J.